AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
By: JENNIFER JUDE
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2663
Fax: (212) 637-2686
E-mail: jennifer.jude@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

RAMESH TADUVAI,

Defendant.

20 Civ. 9822

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff the United States of America (the "United States"), by and through its attorney, Audrey Strauss, Acting United States Attorney for the Southern District of New York, files this Complaint against Ramesh Taduvai ("Taduvai" or "Defendant"), alleging upon information and belief as follows:

## Introduction

1. The United States brings this Complaint seeking damages and penalties against Defendant under the False Claims Act, 31 U.S.C. § 3729 et seq. (the "FCA"), and, in the alternative, under the common law for payment under mistake of fact and unjust enrichment. Between at least February 1, 2013, and February 28, 2014 (the "Covered Period"), Defendant, in his role as part owner and Pharmacist-in-Charge of Manav II, Inc. d/b/a Good Health Pharmacy ("Good Health Pharmacy"), submitted false claims for payment to Medicare Part D sponsors and

the New York State Medical Assistance Program ("N.Y. Medicaid") for prescription drugs that were never dispensed to patients.

**Jurisdiction & Venue**

2. This Court has jurisdiction over the United States' claims under the FCA pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C §§ 1331 and 1345, and over the United States' common law claims pursuant to 28 U.S.C § 1345.

3. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), as well as 28 U.S.C. § 1391(b), because Defendant transacted business in the Southern District of New York and a substantial part of the acts complained of herein took place in this District.

**Parties**

4. Plaintiff is the United States of America. Through its agency the United States Department of Health and Human Services ("HHS"), the United States administers the Medicare and Medicaid programs.

5. Defendant Ramesh Taduvai has been a licensed pharmacist since 1999 and was a 50% owner of Good Health Pharmacy, a retail pharmacy located at 449 West 125th Street, New York, New York 10027, from late 2005 until October 28, 2014. During the Covered Period, Defendant was the supervising pharmacist of Good Health Pharmacy.

**The False Claims Act**

6. The FCA establishes treble damages liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or "knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1).

7. "Knowingly" is defined to include actual knowledge, reckless disregard and deliberate indifference. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

8. Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Program Integrity Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), amended the Social Security Act by adding a new provision that addresses what constitutes an overpayment under the FCA in the context of a federal healthcare program. Under this section, an overpayment is defined as "any funds that a person receives or retains under [Title XVIII or XIX] to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a–7k(d)(4)(B). In addition, this provision specifies in relevant part that an "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified." 42 U.S.C. § 1320a–7k(d)(2). Failure to return any overpayment constitutes a reverse false claim actionable under section 3729(a)(1)(G) of the FCA.

9. In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or false claim. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), the FCA civil penalties are $5,500 to $11,000 for violations occurring on or after September 29, 1999, but before November 2, 2015, see 64 Fed. Reg. 47099, 47103 (1999), and $11,181 to $22,363 for violations occurring on or after November 2, 2015, see 83 Fed. Reg. 3944, 3945 (2018); 28 CFR § 85.5.

## **The Federal Healthcare Programs**

**A. Medicare Part D**

10. Medicare is a federal program that provides federally subsidized health insurance primarily for persons who are 65 or older or disabled. See 42 U.S.C. §§ 1395 et seq. ("Medicare Program"). Part D of the Medicare Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare beneficiaries. All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D.

11. Under Medicare Part D, HHS, through its component agency, the Centers for Medicare and Medicaid Services ("CMS"), contracts with private companies (or "Part D sponsors") to administer prescription drug plans. The Part D sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts. Part D sponsors, in turn, subcontract with pharmacies to provide drugs to the Medicare Part D beneficiaries enrolled in their plans.

12. Generally, when an authorized healthcare provider writes a prescription for a patient who is a Medicare beneficiary, that prescription is submitted to a pharmacy to be filled. When the pharmacy dispenses the prescription drugs to the Medicare beneficiary, the pharmacy submits a claim electronically to the beneficiary's Part D sponsor (usually through the sponsor's Pharmacy Benefit Manager ("PBM")). Thereafter, the pharmacy receives reimbursement from the Part D sponsor (or PBM) for the portion of the drug cost not paid by the beneficiary.

13. The Part D sponsor is required to submit to CMS an electronic notification of the drug dispensing event, called the Prescription Drug Event ("PDE"), which contains data regarding the prescription claim, the prescriber of the drug, how the prescription was transmitted

to the pharmacy, the number of times the prescription was filled, the quantity dispensed, the amount paid to the pharmacy, and information on drug coverage under Medicare Part D.

14. Payments to a Part D sponsor are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program and make payments to the Part D sponsor for qualified drug coverage. 42 C.F.R. § 423.322. CMS's instructions for the submission of Part D prescription PDE claims data state that "information . . . necessary to carry out this subpart" includes the data elements of a PDE. PDE records are an integral part of the process that enables CMS to administer the Part D benefit. Each PDE submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program.

15. CMS gives each Part D sponsor advance monthly payments consisting of the Part D sponsor plan's direct subsidy per enrollee (which is based on a standardized bid made by the Part D sponsor), estimated reinsurance subsidies for catastrophic coverage, and estimated low-income subsidies. *See* 42 C.F.R. §§ 423.315, 423.329. At the end of the payment year, CMS reconciles the advance payments paid to each Part D sponsor with the actual costs the sponsor has incurred. In this reconciliation process, CMS uses the PDE claims data it has received from the Part D sponsor during the prior payment year to calculate the costs the Part D sponsor has actually incurred for prescriptions filled by Medicare beneficiaries under Part D. If CMS determines that it underpaid the sponsor for low-income subsidies or reinsurance costs, it will make up the difference. If CMS overpaid the sponsor for low-income subsidies or reinsurance costs, it will recoup the overpayment from the sponsor. After CMS reconciles a plan's low-income subsidy and reinsurance costs, it then determines risk-sharing amounts owed by the plan

to CMS, or by CMS to the plan, related to the plan's direct subsidy bid. Risk-sharing amounts involve calculations based on whether and to what degree a plan's allowable costs exceeded or fell below a target amount for the plan by certain threshold percentages. 42 C.F.R. § 423.336.

16. The payments made by CMS to the Part D sponsor come from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund. 42 C.F.R. § 423.315(a).

17. In order to receive Part D funds from CMS, Part D sponsors, as well as their authorized agents, employees, and contractors (including pharmacies), are required to comply with all applicable federal laws, regulations, and CMS instructions.

18. By statute, all contracts between a Part D sponsor and HHS must include a provision whereby the Plan sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

19. Medicare Part D sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA. 42 C.F.R. § 423.505(h)(1).

20. In accordance with these express statutory and regulatory requirements, all contracts entered into between CMS and Part D sponsors include a provision in which the sponsor "agrees to comply with . . . federal laws and regulations designed to prevent . . . fraud, waste, and abuse, including, but not limited to, applicable provisions of [the FCA]."

21. CMS regulations further require that all subcontracts between Part D sponsors and downstream entities (including pharmacies) contain language obligating the entity to comply

with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

22. A Part D sponsor also is required by federal regulation to certify to the accuracy, completeness, and truthfulness of the PDE claims data submitted to CMS. C.F.R. § 423.505(k).

23. Compliance with the regulatory requirement that the PDE data submitted to CMS is true, accurate, and complete is a condition of payment under the Medicare Part D program.

24. Medicare regulations further provide: "If the claims data are generated by a related entity, contractor, or subcontractor of a Part D sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

**B. Medicaid**

25. Medicaid is a joint federal-state program created in 1965 that provides healthcare benefits for certain groups, primarily the poor and disabled. Each state administers a state Medicaid program. The federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A). While drug coverage is an optional benefit, the Medicaid programs of all states provide reimbursement for prescription drugs.

26. Once a Medicaid beneficiary submits a prescription to a pharmacy, the pharmacy submits a claim to Medicaid and then dispenses the drug. The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each

state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. § 430.30.

27. Providers who participate in the Medicaid program, including pharmacies, must sign enrollment agreements with their states that certify compliance with the state and federal Medicaid requirements.

28. In New York, pharmacies must periodically sign a “Certification Statement for Provider Billing Medicaid” (“Certification”), in which the pharmacy certifies that claims submitted “to the State’s Medicaid fiscal agent, for services or supplies furnished,” “will be subject to the following certification. . . . I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations.”

29. A pharmacy that is a N.Y. Medicaid provider submits claims for prescription drugs dispensed to Medicaid beneficiaries to N.Y. Medicaid for reimbursement through an electronic claims transmission process. *See* 42 U.S.C. § 1396-1. Each such claim incorporates the above-referenced Certification.

30. Although many providers are direct enrollees in the Medicaid program, several states, including New York, have transitioned into Managed Care. Under Managed Care, states

make Medicaid services available to recipients through health plans provided by Medicaid Managed Care Organizations ("MCOs") that contract with the states.

31. Medicaid pays MCOs a monthly "capitation payment" to provide a bundle of services to Medicaid recipients enrolled in the Medicaid MCO plan. Services provided by MCOs, including prescription drug coverage, depend on their members' medical needs. Some states allow for individual formularies, while other have a unified Preferred Drug List for all of their members regardless of MCO enrollment or fee-for-service coverage.

32. Under Managed Care, third party administrators under contract with MCOs, such as PBMs, send Medicaid reimbursement payments to pharmacies enrolled with, or pre-approved by, the MCOs.

33. A Medicaid beneficiary obtains his or her prescription medications from a pharmacy authorized by the beneficiary's MCO. The pharmacy presents the prescription drug claim under the beneficiary's Medicaid identification number to the PBM.

34. The PBM receives funds to pay Medicaid claims from the MCOs' monthly capitation payments; this money is ultimately used to pay the claims presented by the pharmacy for Medicaid reimbursement.

35. The claims for payment submitted to MCOs are deemed to be "claims" under the FCA since the managed care plan is a "contractor, grantee, or other recipient," the money is being used "to advance a Government program or interest," and the United States provides or has provided a portion of the money requested or will reimburse the MCO for a portion of the money requested. 31 U.S.C. § 3729(b)(2).

36. Pharmacies authorized to provide services to recipients of an MCO also agree to comply with any requirements for participation as a provider in the state.

37. In New York, a standard PBM contract requires pharmacies to agree to "comply with all applicable Laws, including but not limited to those Laws referenced in the Federal and State Laws and Regulations section . . . set forth in the [PBM] Provider Manual," in which a provider agrees "to comply fully and abide by the rules, policies and procedures that the MCO . . . has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, or [state agency] guidelines or policies."

**Defendant's Fraudulent Conduct**

38. During the Covered Period, Defendant was Good Health Pharmacy's Pharmacist-in-Charge and was responsible for the pharmacy's operations and the management of its staff.

39. During the Covered Period, Good Health Pharmacy participated in the Medicare and N.Y. Medicaid programs and dispensed prescription drugs to Medicare and N.Y. Medicaid beneficiaries.

40. During the Covered Period, in accordance with statutory and regulatory requirements, Defendant certified that in submitting claims to be reimbursed as part of the Medicare Part D program, Good Health Pharmacy complied with all applicable federal laws, regulations, and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

41. During the Covered Period, as a condition of Good Health Pharmacy's participation in N.Y. Medicaid, Defendant certified that Good Health Pharmacy had "furnished or caused to be furnished the. . . supplies itemized and done so in accordance with applicable federal and state laws and regulations." N.Y. Medicaid regulations prohibit providers, including pharmacies and pharmacists, from submitting claims for supplies that are not furnished to the beneficiary. *See* N.Y.C.R.R. § 515.2(b)(1)(i)(b).

42. In May 2014, Pharmacy Benefit Manager CVS/Caremark ("CVS") conducted an audit of Good Health Pharmacy that determined that, during the Covered Period, the pharmacy had submitted claims to CVS that were not supported by records showing that the pharmacy actually purchased the medications it claimed to have dispensed.

43. On or about March 8, 2017, Defendant, Good Health Pharmacy, and others were indicted by the Manhattan District Attorney's Office for crimes related to underreporting income by issuing checks, purportedly to pharmaceutical wholesalers, that were deposited into bank accounts controlled by Defendant and other members of the same conspiracy.

44. On or about November 16, 2018, Defendant pled guilty to three counts of criminal tax fraud in the second degree.

45. During the Covered Period, Defendant knowingly submitted claims to Medicare and N.Y. Medicaid for prescription drugs that Defendant purported to have dispensed to patients but which were never actually dispensed. Instead, Defendant issued checks, purportedly to independent pharmaceutical wholesalers, and claimed that these checks were proof that the Good Health Pharmacy had ordered and paid for drugs that the pharmacy billed Medicare and N.Y. Medicaid. In fact, the drugs were not purchased and the checks were instead deposited into bank accounts controlled by Defendant. And approximately 30% of the Medicare claims from the Covered Period were associated with a single prescriber.

46. In total, Defendant submitted thousands of false claims for payment to Medicare and N.Y. Medicaid for prescriptions that were never dispensed to patients and received hundreds of thousands of dollars to which he was not entitled.

47. Had Medicare or N.Y. Medicaid known of Defendant's false billings, it would not have reimbursed Defendant for the prescription drugs that Defendant did not actually dispense.

48. As a result of Defendant's fraudulent conduct, Medicare and N.Y. Medicaid suffered harm when they reimbursed Defendant for medications that were never actually dispensed to patients.

**FIRST CLAIM**

**FALSE CLAIMS ACT: PRESENTING FALSE CLAIMS FOR PAYMENT**
**31 U.S.C. § 3729(a)(1)(A)**

49. The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

50. The United States seeks relief against Defendant under 31 U.S.C. § 3729(a)(1)(A).

51. Through the acts set forth above, Defendant knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented, or caused to be presented, false or fraudulent claims for payment to Medicare and N.Y. Medicaid in connection with the dispensation of prescription medications.

52. Medicare and N.Y. Medicaid made payments to Defendant based on Defendant's false or fraudulent claims.

53. By reason of these false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

**SECOND CLAIM**

**FALSE CLAIMS ACT: USE OF FALSE STATEMENTS**
**31 U.S.C. § 3729(a)(1)(B)**

54. The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

55. The United States seeks relief against Defendant under 31 U.S.C. § 3729(a)(1)(B).

56. Through the acts set forth above, Defendant knowingly, or acting with deliberate ignorance or reckless disregard for the truth, made, used, and caused to be made and used, false records and statements material to false or fraudulent claims in connection with the dispensation of prescription medications.

57. Medicare and N.Y. Medicaid made payments to Defendant based on the false or fraudulent claims.

58. By reason of these false records and statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

**THIRD CLAIM**

**PAYMENT BY MISTAKE OF FACT**

59. The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

60. The United States seeks relief against Defendant to recover monies paid under mistake of fact.

61. The United States made payments to Defendant based on a mistaken and erroneous understanding that Defendant had actually dispensed prescription drugs to Medicare and N.Y. Medicaid beneficiaries.

62. Had the United States known of Defendant's false billings, it would not have reimbursed Defendant for the prescription drugs that Defendant did not actually dispense.

63. By reason of the foregoing, the United States has sustained damages in an amount to be determined at trial.

**FOURTH CLAIM**

**UNJUST ENRICHMENT**

64. The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

65. By receiving payments from the United States for prescription medications that he did not actually dispense, Defendant was unjustly enriched. The circumstances of the receipt of these payments are such that, in equity and good conscience, Defendant should not retain these payments, the amount of which is to be determined at trial.

WHEREFORE, plaintiff the United States requests that judgment be entered in its favor and against Defendant as follows:

a. On the First and Second Claims (FCA violations), a judgment against Defendant for treble damages and civil penalties to the maximum amount allowed by law.

b. On the Third and Fourth Claims (Payment by Mistake of Fact and Unjust Enrichment), a judgment against Defendant for damages to the extent allowed by law.

c. Costs and such other relief as the Court may deem appropriate.

[Intentionally Left Blank]

Date: New York, New York
November 20, 2020

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
*Attorney for United States of America*

By: /s/ *Jennifer Jude*
JENNIFER JUDE
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2663
Fax: (212) 637-2686
E-mail: jennifer.jude@usdoj.gov